IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| AMERICAN CHEMICALS & EQUIPMENT INC. 401(k) RETIREMENT PLAN, | ) ) ) | CASE NO.: 4:14-cv-00044-JAJ-HCA |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANTS' ANSWER** |
| v. | ) | **TO COMPLAINT** |
| | ) | |
| PRINCIPAL MANAGEMENT, CORPORATION and PRINCIPAL GLOBAL INVESTORS, LLC | ) ) ) | |
| | ) | |
| Defendants. | ) | |

Defendants Principal Management Corporation ("PMC") and Principal Global Investors,

LLC ("PGI") (collectively "Defendants") answer Plaintiff's complaint ("Complaint") as follows:

## I.   NATURE OF THE CASE

1.     Principal Management Corporation ("PMC") and Principal Global Investors
("PGI") (collectively, "Defendants") violated Section 36(b) of the Investment Company Act of
1940, 15 U.S.C. § 80a-35(b) ("ICA") by collecting from American Chemicals & Equipment, Inc.
401(K) Retirement Plan ("Plaintiff") and other investors in the following mutual funds (for
whom Defendants act as an investment advisor) excessive management fees: (1) Principal
Lifetime Strategic Income Fund; (2) Principal LifeTime 2010 Fund; (3) Principal LifeTime 2020
Fund; (4) Principal LifeTime 2030 Fund; (5) Principal LifeTime 2040 Fund; and (6) Principal
LifeTime 2050 Fund (*i.e.*, the "Principal Funds").

**ANSWER:**  Defendants admit that PMC and PGI are the investment advisors for each of

the funds identified in Paragraph 1 (which the Complaint refers to as the Principal Funds, but

which will be referred to in this answer as the "LifeTime Funds"), and state that PMC serves as

the advisor and PGI serves as the sub-advisor for those funds.  Defendants deny the remaining

allegations in Paragraph 1.

2.     The Principal Funds are so-called "funds of funds."  That is, each of the Principal Funds invests entirely in other mutual funds. The Principal Funds, then, have privileges with respect to this group of other mutual funds owned by the Principal Funds; as explained further below, the Principal Funds and investors in them like Plaintiff have an interest in this group of securities based on the value thereof. Put most simply, when the mutual funds owned by the Principal Funds rise in value, so, in turn, do the Principal Funds. And vice versa when the mutual funds owned by the Principal Funds decline in value. Tellingly, these underlying mutual funds owned by the Principal Funds are all affiliated with Defendants. That is, they were created, managed and or controlled by Defendants and/or their affiliates. (*See* Principal LifeTime Portfolios: The Convenience of a Single Portfolio, Before and During Retirement, available at https://secure02.principal.com/publicvsupply/GetFile?fm=PQ3483&ty=VOP&EXT=.VOP (last viewed July 3, 2013).)

**ANSWER:** Defendants admit that the LifeTime Funds are "funds of funds" that invest in other mutual funds, in accordance with and as required by 15 U.S.C. § 80A-12.  Defendants further admit that PMC advises the underlying mutual funds in which the LifeTime Funds invest pursuant to a management contract with Principal Funds, Inc.  Defendants admit that the value of each of the LifeTime Funds correlates to the value of the underlying mutual funds in which they invest. Defendants deny all other allegations in Paragraph 2, including any purported characterization of the contents of the document referenced in this paragraph, which speaks for itself.

3.     The Principal Funds each invest in the same underlying pool of roughly twenty mutual funds. Although the Principal Funds invest in the same pool of underlying mutual funds, what makes each individual Principal Fund different – for instance, the Principal Lifetime 2010 Fund as against the Principal Lifetime 2020 Fund – is that Defendants alter the allocation, or ownership percentage, of relative risky and relative conservative mutual funds in the fund mix for each Principal Fund based on a particular target date, or retirement date (the approximate date the investor is expected to start withdrawing money from the Principal Funds). For instance, if an investor's retirement is anticipated to be near the year 2020, he or she could choose the Principal LifeTime 2020 Fund. As that individual's anticipated retirement date approaches (in this example, 2020), the investment mix in the Principal Lifetime 2020 Fund becomes more conservative by increasing its investors' exposure to generally more conservative investment options. (*See e.g.,* Principal LifeTime 2020 Fund (A) (PTBAX) available at https://www.principalfunds.com/InvestmentProfiles/index.faces?symbol =PTBAX=true&pf=true (last viewed on July 3, 2013).)

**ANSWER:**  Defendants admit the allegations in the third sentence of Paragraph 3.

Defendants deny the allegations of the first sentence of Paragraph 3 to the extent it alleges that

the investment options for the LifeTime Funds are limited to "roughly twenty mutual funds."

Defendants also deny the second and fourth sentences of Paragraph 3 because the use of "relative

risky and relative conservative mutual funds" and "conservative investment options" are vague

and ambiguous.  Inasmuch as the allegations in the first, second and fourth sentences purport to

characterize the contents of the document referenced in this paragraph, Defendants also deny

those allegations because the document speaks for itself.

4.      PGI is primarily responsible for developing and monitoring the risk profiles and
for rebalancing risk profiles for each Principal Fund. PMC is primarily responsible for portfolio
construction decisions and the selection and monitoring of each underlying mutual fund in the
Principal Funds. (*See* Principal LifeTime Portfolios:  Managed by Principal Management
Corporation and Principal Global Investors, available at
http://www.principal.com/allweb/docs/ris/investments/profile/1/PJ_1001.pdf (last viewed on
July 3, 2013).)

**ANSWER:**  Defendants admit that PGI is responsible for, *inter alia*, developing and

monitoring the strategic or long-term asset class targets and rebalancing ranges for each of the

LifeTime Funds.  Defendants admit that PMC is responsible for, *inter alia*, portfolio construction

decisions and the selection and monitoring of each underlying fund.  Defendants deny that the

document cited in Paragraph 4 characterizes the responsibilities of PGI or PMC as "primar[y]"

responsibilities, and Defendants also deny the allegations insofar as they purport to characterize

or summarize the contents of the cited document, which speaks for itself.

5.      Defendants' marketing materials describe the Principal Funds' investment process
with a graphic that appears as follows:

| Principal Lifetime Portfolios' Investment Process | | | |
|---|---|---|---|
| **Step 1:**<br><br>**Asset Class Selection** | **Step 2:**<br><br>**Glide Path Structure** | **Step 3:**<br><br>**Portfolio Construction** | **Step 4:**<br><br>**Disciplined Rebalancing** |

**ANSWER:**  Defendants admit that the graphic shown in Paragraph 5 is included in the document cited in Paragraph 4, but deny the allegations in Paragraph 5 to the extent they purport to characterize or summarize the contents of the document cited in Paragraph 4, which speaks for itself.

6.      Defendants explain that Step 1 is the selection of asset classes and their corresponding benchmarks. Defendants select every asset class used in the Principal Funds. Defendants assert that every asset class must meet Defendants' proprietary eligibility requirements, including: (a) risk premiums are commensurate with the asset class risk profile; (b) the asset class provides diversification benefits; and (c) suitable implementation vehicles exists that permit efficient access to the asset class. (*See* Principal LifeTime Portfolios: Managed by Principal Management Corporation and Principal Global Investors, available at http://www.principal.com/allweb/docs/ris/investments/profile/1/PJ_1001.pdf (last viewed on July 3, 2013).)

**ANSWER:**  Defendants deny the allegations in Paragraph 6 because they purport to characterize or summarize the contents of the document cited in this paragraph, which speaks for itself.

7.      Defendants explain that Step 2 is the design of the glide path for the Principal Funds. To develop the glide path, PMC analyzes investing and spending scenarios using proprietary capital market assumptions and a variety of optimization and stochastic modeling tools. The glide path reflects what PMC believes to be the optimal asset allocation mix for the time horizon of the unique Principal Funds. (*Id.*)

**ANSWER:** Defendants deny the allegations in Paragraph 7 because they purport to characterize or summarize the contents of the document cited in Paragraph 6, which speaks for itself.

8.      Defendants further explain that Step 3 in the investment process involves the selection and monitoring of the Principal Funds' underlying mutual fund investments and sub-advisors. Defendants boast that their selection and management of sub-advisors for the Principal Funds provides a rigorous and disciplined framework for identifying, hiring, and retaining the premier sub-advisors within each asset class and investment style.

**ANSWER:** Defendants deny the allegations in Paragraph 8 because they purport to characterize or summarize the contents of the document cited in Paragraph 6, which speaks for itself.

9.      Step 4 in the investment process is rebalancing. Defendants' view rebalancing as a risk management service; thus, a primary focus is to control and manage systemic risks, not forecast short-term market trends. (*Id.*)

**ANSWER:** Defendants deny the allegations in paragraph 9 because they purport to characterize or summarize the contents of the document cited in Paragraph 6, which speaks for itself.

10.     Defendants identify five individuals as in internal "Portfolio Managers" for the Principal Funds: (1) Jeffrey R. Tyler; (2) Dirk Laschanzky; (3) David M. Blake; (4) Randy L. Welch; and (5) James Fennessey. Defendants' online biographies for these five individuals reveal that they provide services not just to the Principal Funds, but that they, among other things, "oversee[s] portfolio management and research conducted by investment teams involved in various traditional, alternative, and structured product strategies, serve on the boards of several affiliates" and lead a "research team that is responsible for analyzing, interpreting and coordinating investment performance data and evaluation of the investment managers under the due diligence process that monitors investment managers used by Principal Funds, Inc." (*See* Principal Financial Group, *Portfolios Manager Biographies,* available at http://www.principals.com/retirement/lifetime/main/bios.htm (last viewed July 3, 2013).)

**ANSWER:** Defendants admit that Jeffrey R. Tyler, Dirk Laschanzky, Randy L. Welch, and James Fennessey were the portfolio managers of the LifeTime Funds when the Complaint was filed and continue to serve in that position. Defendants deny that David M. Blake is currently a portfolio manager for the Lifetime Funds, and state that, in March 2013, Matthew

Annenberg replaced David M. Blake as one of the portfolio managers. Defendants deny the

remaining allegations in Paragraph 10 because they purport to characterize or summarize the

contents of the document cited in this paragraph, which speaks for itself.

11.     Defendants collect what they call an Investment Management Fee from the
Principal Funds for providing *all* of the services identified above. Defendants' Investment
Management Fee is based not on any objectively assessed value for services provided to the
Principal Funds, but, rather, as a percentage of the assets of the Principal Funds. As such, the
more investor money that flows into the Principal Funds, the more fee revenue Defendants rake
in – regardless of the objective value of the actual services that Defendants provide to the
Principal Funds.

**ANSWER:**  Defendants admit that the LifeTime Funds pay an Investment Management

Fee to PMC, which then pays a sub-advisory fee to PGI. Defendants deny the remaining

allegations in Paragraph 11.

12.     Defendants' Investment Management Fee for the Principal Funds at issue here is
three basis points annually. Since 2001, more than $21 billion has flowed into the Principal
Funds; consequently, Defendants have obtained in that time period more than $70 million in
Investment Management Fees from the Principal Funds. (*See e.g.,* Principal LifeTime Portfolios:
The Convenience of a Single Portfolio, Before and During Retirement, available at
https://secure02.principal.com/publicvsupply/GetFile?fm= PQ3483&ty=VOP&EXT=.VOP (last
viewed July 3, 2013).)

**ANSWER:**  Defendants admit the first sentence in Paragraph 12.  Defendants deny the

second sentence of Paragraph 12 because "flowed into" and "obtained" are vague and

ambiguous.  Defendants deny the remaining allegations in Paragraph 12 because they purport to

characterize or summarize the contents of the document cited in this paragraph, which speaks for

itself.  Defendants otherwise deny the remaining allegations of Paragraph 12.

13.     To be clear, Plaintiff here does not challenge the propriety of Defendants'
assessment of its Investment Management Fee to investors like Plaintiff in the Principal Funds.

**ANSWER:**  Defendants admit the allegations of Paragraph 13.

14.     Instead, Plaintiff here challenges and seeks recovery of part or all of a fee charged
to investors in the Principal Funds that Defendants call the Acquired Fund Fee. The Acquired
Fund Fee is comprised of two parts: (1) an amount pocketed by sub-advisors to the Principal
Funds and (2) an amount pocketed by Defendants from investors in the Principal Funds.

**ANSWER:**  Defendants admit that Plaintiff purports to base its claims on the line item identified in the prospectus as "Acquired Fund Fees and Expenses" ("AFFE").  Defendants deny the remaining allegations of Paragraph 14.

15.     Defendants in the first instance pocket the entire Acquired Fund Fee from the Principal Funds as investor money. (*See, e.g.*, http://quote.morningstar.com/fund-filing/Prospectus/2012/2/29/t.aspx?t=PVASX&ft=&d=572a2816d3f488299edc0195ae15b8ba) (prospectus for Principal LifeTime 2010 R1 share class fund held by Plaintiff describing fees charged by Defendants and stating that the Acquired Fund Fee is a fee that "***you pay each year as a Percentage of the value of your investment***") (emphasis added) (last viewed on July 3, 2013).) Defendants  retain  a portion of the Acquired Fund Fee and then pass down the remainder of the Acquired Fund Fee to the various sub-advisors to the Principal Funds. As such, the process by which Defendants collect this fee, retain portions of it for Defendants, and then distribute remaining portions of it to the Principal Funds' sub-advisors is illustrated in the following graph.



**ANSWER:**  Defendants deny the allegations of Paragraph 15, including, without limitation, to the extent they purport to characterize or summarize the contents of the document cited in this paragraph, which speaks for itself.

16.     Defendants unilaterally decide how much in Acquired Fund Fees to charge and collect from the Principal Funds. Data demonstrates that the process by which Defendants decide how much in Acquired Fund Fees to charge and collect from the Principal Funds is

arbitrary and capricious. The amounts charged and collected by Defendants from the Principal Funds, as demonstrated in the table below, do not correspond to any value-added services that Defendants provide to the Principal Funds. Defendants simply "pad" the Acquired Fund Fee with an unreasonably lucrative profit margin for Defendants and use it as a pretext to transfer wealth of the Principal Funds to Defendants for their own benefit and to the detriment of the Principal Funds.

**ANSWER:**  Defendants deny the allegations of Paragraph 16.

17.    As noted above, the Principal Funds invest only in other mutual funds. The underlying mutual fund managers, or sub-advisors, provide, with minor exceptions, all day-to-day investment management services for the underlying mutual funds. To wit, Defendants admit in many solicitation materials and in numerous financial statement footnotes that "multiple sub-advisors [] are responsible for the day-to-day [investment] management responsibilities" of the Principal Funds. (*See* Principal Financial Group, *Investment Performance*, available at http://www.principal.com/retirement/lifetime/pdf/lifetime-performance.pdf. (last viewed, July 3, 2013).)

**ANSWER:**  Defendants admit the first sentence of Paragraph 17.  Defendants deny the

second sentence of Paragraph 17, and state that each of the underlying funds in which the

LifeTime Funds invest have an advisor and one or more sub-advisors.  Defendants deny the third

sentence of Paragraph 17 because it purports to characterize or summarize the contents of the

cited document, which speaks for itself.

18.    The sub-advisors' portion of the Acquired Fund Fee for the Principal Funds amounts to about 23 basis points (on average) annually. In 2012, the sub-advisors' portion of the Acquired Fund Fee in dollar terms amounted to approximately $40 million. The sub-advisors ostensibly earn their portion of the Acquired Fund fee by carrying out the day-to-day investment management work for all of the mutual funds owned by the Principal Funds.

**ANSWER:**  Defendants deny the allegations of Paragraph 18.

19.    Defendants' portion of the Acquired Fund Fee equals about 67 basis points (on average) annually. In 2012, Defendants' portion of the Acquired Fund Fee amounted to approximately  $80 million in dollar terms – *about double that of the sub-advisors who actually provided the day-to-day investment management services for the Principal Funds*. Defendants did little, if anything, to justify collecting $80 million in Acquired Funds Fees from the Principal Funds. In essence, Defendants collected and retained about $80 million for mainly acting as a fee conduit to the sub-advisors for the Principal Funds.

**ANSWER:**  Defendants deny the allegations of Paragraph 19.

20.    The table below summarizes the 2012 aggregate Acquired Fund Fees paid by the Principal Funds (at currently prevailing asset levels).

| Underlying Mutual Fund | Sub-Advisors' Portion of Acquired Fund Fee | Defendants' Portion of Acquired Fund Fee | Total Acquired Fund Fee |
|---|---|---|---|
| Principal Core Plus Bond I | $2,856,711 | $3,860,803 | $6,717,514 |
| Principal Diversified Real Asset | $1,760,985 | $1,948,776 | $3,709,761 |
| Principal Equity Income | $239,197 | $1,226,490 | $1,465,687 |
| Principal Global Div. Inc. | $859,084 | $909,134 | $1,768,218 |
| Principal Global Real Estate Sec | $3,987,797 | $2,670,705 | $6,658,502 |
| Principal International I | $1,585,967 | $2,349,080 | $3,935,047 |
| Principal LargeCap Growth I | $4,942,585 | $5,699,142 | $10,641,727 |
| Principal LargeCap Value | $987,671 | $2,675,714 | $3,663,385 |
| Principal LargeCap Value I | $3,113,969 | $9,694,826 | $12,808,795 |
| Principal MidCap Growth III | $760,891 | $3,132,573 | $3,893,464 |
| Principal MidCap Value I | $1,263,853 | $2,851,597 | $4,115,450 |
| Principal Overseas | $4,071,920 | $7,777,028 | $11,848,948 |
| Principal Real Estate Sec | $69,739 | $55,808 | $125,547 |
| Principal Inflation Protection | $360,606 | $1,406,580 | $1,767,186 |
| Principal Bond Market Index | $514,054 | $1,986,983 | $2,501,037 |
| Principal LargeCap S&P 500 Index | $170,580 | $1,570,033 | $1,740,613 |
| Principal Bond & Mortgage | $1,402,033 | $5,026,381 | $6,428,414 |
| Principal Short-Term Income | $278,352 | $764,540 | $1,042,892 |
| Principal High Yield I | $1,032,356 | $915,987 | $1,948,343 |
| Principal MidCap Blend | $168,153 | $685,946 | $854,099 |
| Principal Small Cap Growth I | $1,600,219 | $1,976,035 | $3,576,254 |
| Principal Small Cap Value II | $1,448,797 | $1,903,352 | $3,352,149 |

| | | | |
|---|---|---|---|
| Principal Large Cap Growth | $607,999 | $3,374,858 | $3,982,857 |
| Principal Diversified International | $992,582 | $7,016,679 | $8,009,261 |
| Principal Emerging Market | $3,110,781 | $4,374,782 | $7,485,563 |
| Principal Intl  Equity Index | $200,971 | $1,024,793 | $1,225,764 |
| Principal Global Multi-Strategy | $1,776,655 | $1,812,922 | $3,589,577 |
| Principal Preferred | $424,573 | $1,046,948 | $1,471,521 |
| **Total** | **$40,570,399** | **$79,757,173** | **$120,327,572** |

**ANSWER:**  Defendants deny the allegations of Paragraph 20.

21.    The $40 million total Acquired Fund Fee amount conveyed to the sub-advisors here indicates in light of the foregoing that the roughly $80 million of the Acquired Fund Fee retained by Defendants is grossly excessive and a clear breach of Defendants' statutory fiduciary duties to the Principal Funds.

**ANSWER:** Defendants deny the allegations of Paragraph 21.

22.    Again the sub-advisors here provided the day-to-day investment management services for the Principal funds. Yet Defendants nonetheless collected roughly twice as much in fees as did the sub-advisors from the Principal Funds. And for what?  Defendants collected nearly $80 million in exchange for little, if any, actual services provided to the Principal Funds.

**ANSWER:**  Defendants admit that PGI provides day-to-day investment management

services to the LifeTime Funds.  Defendants deny the remaining allegations of Paragraph 22.

23.    The amount of the Acquired Fund Fee that Defendants took from the Principal Funds is under all the circumstances so disproportionately large that it bears no reasonable relationship to the services rendered in exchange for that fee (if any) and could not have been the product of arm's length bargaining. *See Jones v. Harris*, 559 U.S. 335 (2010) (investment advisors breach their fiduciary duties to mutual funds when they collect fees from mutual funds that are so disproportionately large that the fees bear no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining).

**ANSWER:**  Defendants deny the allegations of Paragraph 23.

24.    Plaintiff seeks here recovery of damages resulting from Defendants' aforementioned breaches of duty, which includes a substantial amount of the compensation and payments received by Defendants from the Principal Funds via the Acquired Fund Fee.

**ANSWER:**  Defendants admit that Plaintiff seeks recovery of damages, but deny the

remaining allegations in Paragraph 24.

25.     Plaintiff, with respect to its claims for a violation of Section 36(b) of the ICA seeks a recovery from the earliest date permitted by the statute through the latest date permitted by the statute.

**ANSWER:**  The allegations in Paragraph 25 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

26.     Plaintiff brings this action derivatively pursuant to Section 36(b) of the ICA on behalf of the Principal Funds.

**ANSWER:**  The allegations in Paragraph 26 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

27.     All conditions precedent hereto have been performed or have occurred.

**ANSWER:**  The allegations in Paragraph 27 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

## II.     THE PARTIES

28.     Plaintiff is a retirement plan of an Alabama corporation, which has its principal place of business in Birmingham, Alabama. At all relevant times, Plaintiff was and is a shareholder of the Principal Funds.

**ANSWER:**  Defendants admit Plaintiff is a shareholder of each of the LifeTime Funds,

but not the underlying funds in which the Lifetime Funds invest. Defendants lack knowledge and

information sufficient to admit or deny the remaining allegations in Paragraph 28.

29.     Defendant PMC is an Iowa corporation with its principal place of business in Des Moines, Iowa. PMC has been registered with the Securities Exchange Commission ("SEC") as an investment adviser under the ICA since 1968. PMC is an investment advisor to the Principal Funds. (*See* Principal Management Corporation, *Principal LifeTime Portfolios Managed by Principal Management Corporation and Principal Global Investors*, available at http://www.principal.com/allweb/docs/ris/investments/profile/1/PJ_1001.pdf (last viewed June 24, 2013).)  As an investment advisor to the Principal Funds, PMC owes a fiduciary duty under the ICA to Plaintiff and all shareholders of the Principal Funds.

**ANSWER:**  Defendants admit the first and third sentences of Paragraph 29.  Defendants deny the second sentence of Paragraph 29 because PMC is registered as an investment advisor under the Investment Advisers Act, not under the ICA.  Defendants deny the allegations in Paragraph 29 to the extent that they purport to characterize or summarize the contents of the document cited in this paragraph, which speaks for itself.  The remaining allegations in Paragraph 29 are legal arguments that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

30.    Defendant Principal Global Investors ("PGI") is an Iowa corporation with its primary place of business in Des Moines, Iowa. PGI is affiliated with PMC. PGI is an investment advisor to the Principal Funds. (*See* Principal Management Corporation, *Principal LifeTime Portfolios Managed by Principal Management Corporation and Principal Global Investors*, available at http://www.principal.com/allweb/docs/ris/investments/profile/1/P J_1001.pdf (last viewed June 24, 2013).)  As an investment advisor to the Principal Funds, PGI owes a fiduciary duty under the ICA to Plaintiff and all shareholders of the Principal Funds.

**ANSWER:**  Defendants deny that PGI is a corporation; rather, PGI is an Iowa limited liability company.  Defendants admit that PGI's primary place of business is Des Moines, Iowa. Defendants admit the second and third sentences of Paragraph 30.  Defendants deny the allegations in Paragraph 30 to the extent that they purport to characterize or summarize the contents of the document cited in this paragraph, which speaks for itself.  The remaining allegations in Paragraph 30 are legal arguments that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

## III.    JURISDICTION AND VENUE

31.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 80a-43, 15 U.S.C. § 80a-35(b)(5), and 28 U.S.C. § 1331.

**ANSWER:**  Defendants deny that this Court (or any other) has subject matter jurisdiction over Plaintiff's claims because Plaintiff lacks standing to assert the claims alleged.

32.     Venue is proper in this judicial district pursuant to 15 U.S.C. § 80a-43 and 28 U.S.C. § 1391(b)(2)-(3). Defendants are inhabitants of or transact business in this district, a substantial part of the events or omissions that give rise to Plaintiff's claims occurred in this district.

**ANSWER:** The allegations in Paragraph 32 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants admit that venue is proper in the

Southern District of Iowa.

## IV.   BACKGROUND

33.     Congress recognized as early as 1935 that mutual funds "present[ed] special features which require[d] attention beyond simply the disclosure philosophy of the Securities Act of 1933." (*See* H.R. Rep. No. 91-1382, p. 2 (1970), because "a typical [mutual] fund is organized by its investment advisor which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the advisor.")  (*See also* S. Rep. no. 91-184, p. 5 (1969).)  Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy." (*Id.*)  Rather, "the relationship between investment advisors and mutual funds is fraught with potential conflicts of interest," *Burks v. Lasker,* 441 U.S. 471, 481 (1979), and potentially incestuous."  *Garternberg v. Merrill Lynch Asset Management, Inc.*, 694 F.2d 923, 929 (2d Cir. 1982).

**ANSWER:** The allegations in Paragraph 33 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

34.     Accordingly, in 1940, Congress enacted the ICA recognizing that:

> The national public interest and the interest of investors are
> ***adversely affected*** . . . when investment companies are organized,
> operated [and] managed . . . in the interest of . . . investment
> advisers . . . rather than in the interest of [shareholders] . . . or
> when the investment companies . . . are not subjected to adequate
> independent scrutiny.

ICA § 1(b)(2), 15 U.S.C. § 80a-1(b) (1994)  (emphasis added). The ICA  was designed to regulate and to curb abuses in the mutual fund industry and to create standards of care applicable to investment advisors and distributors.

**ANSWER:** The allegations in Paragraph 34 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

35.     In the 1960's, Congress realized that investment advisors were still gouging mutual funds with excessive fees. A report produced by the Wharton School that was commissioned by the SEC found that investment advisers tended to charge mutual funds "substantially higher" rates than they charged other clients. (*A Study of Mutual Funds Prepared for the Securities and Exchange Commission by the Wharton School of Finance and Commerce*, H.R. Rep. No. 2274, p. 29 (1962).)

**ANSWER:**  The allegations in Paragraph 35 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

36.     As a result, Section 36(b), 15 U.S.C. §80a-35(b) was added to the ICA in 1970, which created a federal cause of action for breach of fiduciary duty. Section 36(b) imposes a fiduciary duty on mutual fund investment managers (and their affiliates) with respect to the receipt of compensation for services, specifically providing that:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection . . . by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor . . . for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

**ANSWER:**  The allegations in Paragraph 36 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

37.     Further, notwithstanding requirements regarding the increased disinterestedness of the board, "Congress decided not to rely solely on the fund's directors to assure reasonable adviser fees," *Daily Income Fund*, 464 U.S. at 540, also adding a provision to Section 36(b) that provides:

> In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate ***under all the circumstances***.

15 U.S.C. § 80a-35(b)(2) (emphasis added). Through Section 36(b), Congress gave shareholders a "unique right," *Daily Income Fund*, 464 U.S. at 536, giving them the ability to be an independent check on unfair fees while leaving "the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached [] with the court."  (S. Rep. 91-184, p. 6.)

**ANSWER:**  The allegations in Paragraph 37 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

38.    Mutual fund fees cause a dramatic decrease in investment returns over time. Arthur Levitt, past Chairman of the SEC, criticized this "tyranny of compounding high costs":

> Instinct tells me that many investors would be shocked to know how seemingly small fees can over time, create such drastic erosion in returns. . . . In the years ahead, what will mutual fund investors say if they realize too late their returns have fallen hard under the weight of compounding fees?

(Arthur Levitt, Jr., Inaugural address: Costs Paid with Other People's Money, Address at Fordham University School of Law (Nov. 3, 2000), in 6 Fordham J. Corp. & Fin. L. 261, 267 (2001).)

**ANSWER:**  The allegations in Paragraph 38 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

39.    When the Defendants start a new mutual fund, they not only contract to provide all the services the fund needs but they also nominate and elect the fund's board of directors. The board of directors meets several times a year. The directors are compensated for their services with a fee based on a schedule that takes into account an annual retainer, the number of meetings attended, and expenses incurred. Directors are typically paid far in excess of $100,000 per year for serving on the board. As a result, board membership in the Principal Funds is a lucrative part-time job, the continuation of which is dependent (at least in part) on the continued good will and support of Defendants.

**ANSWER:**  Defendants admit the second sentence of Paragraph 39.  Defendants also

admit that director compensation is based upon a number of factors, including an annual retainer,

the number of meetings attended and expenses incurred.  Defendants state that, as publicly

disclosed, the Principal Funds, Inc. board members received compensation for the fiscal year

ended October 31, 2012, for example, that was greater than $100,000 for their service to all

Principal mutual funds (including the LifeTime Funds).  Defendants deny the remaining

allegations in Paragraph 39.

        40.      While mutual fund boards are supposed to be the "watchdogs" for the shareholders of the funds, two noteworthy industry insiders have commented on the general failure of mutual fund boards to fulfill their responsibilities under the ICA. Jack Bogle, founder of The Vanguard Group, Inc. ("Vanguard") made the following comment:

> Well, fund directors are, or at least to a very major extent, sort of
> a bad joke. They've watched industry fees go up year after year,
> they've added 12b-1 fees. I think they've forgotten, maybe they've
> never been told, that the law, the Investment Company Act,
> says they're required to put the interest of the fund shareholders
> ahead of the interest of the fund adviser. It's simply impossible
> for me to see how they could have ever measured up to that
> mandate, or are measuring up to it.

        **ANSWER:**  The allegations in Paragraph 40 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

        41.      Warren Buffet, famous investor and chairman of Berkshire Hathaway, made the following comment, which was aptly quoted by a United States District Court:

> I think independent directors have been anything but independent.
> The Investment Company Act, in 1940, made these provisions for
> independent directors on the theory that they would be the
> watchdogs for all these people pooling their money. The behavior
> of independent directors in aggregate since 1940 has been to
> rubber stamp every deal that's come along from management—
> whether management was good, bad, or indifferent. Not negotiate
> for fee reductions and so on. A long time ago, an attorney said that
> in selecting directors, the management companies were looking for
> Cocker Spaniels and not Dobermans. I'd say they found a lot of
> Cocker Spaniels out there.

*Strougo v. BEA Assoc.*, 188 F. Supp. 2d 373, 383 (S.D.N.Y. 2002) (citation omitted).

        **ANSWER:**  The allegations in Paragraph 41 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

        42.      Mr. Buffet further observed, in his letter to shareholders in the 2002 Berkshire Hathaway, Inc. annual report:

> [A] monkey will type out a Shakespeare play before an
> 'independent' mutual fund director will suggest that his fund look
> at other managers, even if the incumbent manager has persistently
> delivered substandard performance. When they are handling their
> own money, of course, directors will look to alternative advisors –
> but it never enters their minds to do so when they are acting as
> fiduciaries for others . . . . Investment company directors have
> failed as well in negotiating management fees . . . If you or I were
> empowered, I can assure you that we could easily negotiate
> materially lower management fees with the incumbent managers of
> most mutual funds. And, believe me, if directors were promised a
> portion of any fee savings they realized, the skies would be filled
> with falling fees. Under the current system, though, reductions
> mean nothing to 'independent' directors while meaning everything
> to managers. So guess who wins? . . . [I]n stepping up to [their]
> all-important responsibilities, tens of thousands of "independent"
> directors, over more than six decades, have failed miserably.
> (They've succeeded, however, in taking care of themselves; their
> fees from serving on multiple boards of a single "family" of funds
> often run well into six figures.)

2002 Berkshire Hathaway, Inc. Annual Report to Shareholders, p. 17 – 18.

**ANSWER:** The allegations in Paragraph 42 are legal arguments that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

43.    The watchfulness and effectiveness of mutual fund boards of directors continues
to be an issue today. Indeed, as Judge Posner recently observed in his dissent from the denial
of a petition for rehearing en banc in another case brought under Section 36(b), there are
"growing indications that executive compensation in large publicly traded firms often is
excessive because of the feeble incentives of boards of directors to police compensation."
*Jones v. Harris*, 537 F.3d 728, 730 (2008), *cert. granted*, 559 U.S. 335, 129 S. Ct. 1579 (2010).
Indeed, "'broad cross-sectional analysis reveals little consistent evidence that board composition
is related to lower fees and higher returns for fund shareholders.'" *Id*. at 731 (quoting OEA
Memorandum: Literature Review on Independent Mutual Fund Chairs and Directors," Dec. 29,
2006).

**ANSWER:**  The allegations in Paragraph 43 are legal arguments not requiring admission

or denial, but to the extent they do, Defendants deny all of those allegations.

## V.       SUBSTANTIVE ALLEGATIONS

44.      An investment advisor's fiduciary duty encompasses both full disclosure and substantive fairness as concerns fund fee assessments. Indeed, an advisor "may not overreach in the amount of his fee even though the other party to the transaction, in full possession of all the facts, does not believe the fee is excessive." December 17, 1969 Letter from the Investment Company Institute included with Mutual Funds Amendments (Part I): Hearings before the Subcomm. on Commerce and Finance of the H. Comm. on Interstate and Foreign Commerce, 91st Cong., at 441 (1969) ("1969 Hearings"). *See also* S. Rep. 91-184, pp. 15-16 ("the ultimate test, ***even if the compensation or payments are approved by the directors*** . . . will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee") (emphasis added).

**ANSWER:** The allegations in Paragraph 44 are legal arguments that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

45.      The essence of a claim for excessive or unfair fees under the Section 36(b) of the ICA is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. 295, 306-307 (1939). "To face liability under § 36 an investment adviser must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris,* 559 U.S. 335, 346 (2010).

**ANSWER:** The allegations in Paragraph 45 are legal arguments that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

46.      The test for determining whether a fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining includes consideration of the following six factors: (1) the nature and quality of the services rendered; (2) the profitability of the funds to the advisor/manager; (3) economies of scale; (4) comparative fee structure; (5) fallout benefits (*i.e.*, indirect profits to the advisor/manager resulting from the existence of the funds); and (6) the care and conscientiousness of the directors. A review of these factors, and the facts of this case, demonstrates that the fees collected by Defendants from the Principal Funds violate Section 36(b).

**ANSWER:** The allegations in Paragraph 46 are legal arguments that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

### The Nature and Quality of the Services Rendered

47.      The nature and quality of Defendants' services to the Principal Funds in exchange for Defendants' $80 million share of the Acquired Fund Fee is extremely limited.

**ANSWER:** Defendants deny all allegations in Paragraph 47.

48.     To put Defendants' retention of Defendants' $80 million of the Acquired Fund Fee in proper context, worth noting is that Defendants collect in addition to this portion of the Acquired Fund Fee an Investment Management Fee for the services described in paragraphs 3 through 12 of this Complaint. Defendants do not provide additional services to the Principal Funds beyond those they perform in exchange for collecting the Investment Management Fee as described in paragraphs 3 through 12 of this Complaint that would justify under Section 36(b) of the ICA Defendants' collection of roughly $80 million of the Acquired Fund Fee that Defendants charged Plaintiffs and other investors in the Principal Funds. Indeed, a comparison between the services Defendants provided to the Principal Funds in exchange for the Investment Management Fee (three basis points) and the services Defendants putatively provided to the Principal Funds in exchange for their retained portion of the Acquired Fund Fee illustrates beyond any question that Defendants' portion of the Acquired Fund Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

**ANSWER:**  Paragraph 48 refers to Paragraphs 3 through 12, and thus, Defendants

incorporate and adopt their answers to Paragraphs 3 through 12 as if fully set forth herein.

Defendants deny all remaining allegations in Paragraph 48.

49.     As noted above, a comparison of the services provided by the sub-advisors who provided the day-to-day investment services to the Principal Funds and took $40 million of the Acquired Fund Fee with the services provided by Defendants who *did not* provide day-to-day investment services to the Principal Funds in exchange for their share of the Acquired Fund fee yet nonetheless collected $80 million of the Acquired Fund Fees is further evidence that Defendants' portion of the Acquired Fund Fee is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining.

**ANSWER:**  Defendants deny the allegations in Paragraph 49.

50.     Defendants use the same or a similar pool of affiliated mutual funds to create the same or similar investment vehicles for Defendants' institutional and other clients as they use to confect the asset base of the Principal Funds, but at a dramatically lower cost than the fees Defendants collect from the Principal Funds at issue in this case.

**ANSWER:**  Defendants deny the allegations in Paragraph 50.

51.     Despite the fact that the Principal Funds receive identical investment management services as Defendants' institutional and other clients, the Principal Funds pay Defendants dramatically higher Acquired Fund Fees because the fees are not negotiated in good faith at arm's length as they are with institutional and other clients that are not affiliated or controlled by Defendants the way the Principal Funds are controlled. Nor objectively are Defendants' fees (in terms of dollar amount) similar in any respect to fees one would see ensue from arm's

length negotiations. This disparity in fees reflects Defendants' willingness and determination to prefer their own financial interests to the interests of the Principal Funds and the shareholders of the Principal Funds.

**ANSWER:**  Defendants deny the allegations in Paragraph 51.

52.     By way of one example, Defendants are affiliated with an investment advisor named Edge Asset Management ("Edge"). Edge provides non-affiliated retirement plans and institutional investors with the same or similar investment management services that Defendants and the sub-advisors provide to the Principal Funds here.

**ANSWER:**  Defendants admit that Edge is affiliated with Defendants, but deny the

remaining allegations in Paragraph 52.

53.     Edge represents itself as a leading manager of asset allocation strategies that employs a tenured team of 23 investment professionals. Edge boasts that it is at the forefront of innovation in this field and asserts that it is a pioneer in target date fund risk allocation. Edge further boasts that as an affiliate of PGI, it is able to employ the focus of a boutique firm while leveraging the resources of a global leader. Defendants are certainly aware of Edge and the services it provides and the fees it charges for these services. To be sure, Edge is even a sub-advisor to the Principal Funds.

**ANSWER:**  Defendants admit that Edge serves as a sub-advisor to certain funds within

the Principal mutual fund complex, and admit further that they are aware of the fees that Edge

receives from PMC and the services Edge provides in connection with its receipt of those fees.

The allegations in the first, second, and third sentences of Paragraph 53 appear to reflect

Plaintiff's summary or characterization of certain statements that Edge may have made in a

document or elsewhere and, thus, Defendants deny all such summaries or characterizations and

refer Plaintiff to that document(s), which speaks for itself.  Defendants deny all remaining

allegations in Paragraph 53.

54.     In an arm's length relationship, Edge would charge the Principal Funds no more than 23 basis points annually for the combined services that the Principal Funds are presently paying in excess of 100 basis points to receive. That is, both the Investment Management Fee and the Acquired Fund Fee. This means the entire portion of the Acquired Fund Fee that Defendants collect from the Principal Funds ($80 million per year) is grossly excessive.

**ANSWER:**  Defendants deny all allegations in Paragraph 54.

55.     Defendants repeatedly put their own financial interests ahead of the interests of Plaintiff and other shareholders of the Principal Funds by participating in arrangements and schemes that benefit Defendants at the expense of Plaintiff and the Principal Funds. The cost of this conflict of interest, which does not exist in the case of the arm's length relationships with institutional clients, is reified in the excessive fees complained of herein, but also in other losses borne by the Principal Funds.

**ANSWER:**  Defendants deny all allegations in Paragraph 55.

56.     Defendants' willingness and determination to prefer their own financial interests to the interests of the Principal Funds and shareholders of the Principal Funds like Plaintiff shows through in the nature and quality of the services that Defendants render to the Principal Funds. Again, Defendants contract with sub-advisors to provide the Principal Funds with the daily investment management services the Principal Funds require. And yet Defendants collected nearly $120 million annually from the Principal Funds ostensibly for investment management services, while Defendants only conveyed roughly $40 million of that roughly $120 million to these contracted sub-advisors as ostensible compensation for their aforementioned investment management services. Put bluntly, it is the sub-advisors who actually provide the vast majority of such investment management services as are provided to the Principal Funds.

**ANSWER:**  Defendants admit that each of the LifeTime Funds has a sub-advisor.

Defendants deny all remaining allegations in Paragraph 56.

57.     Additionally, even though the Principal Funds invest in mutual funds created, managed, and controlled by Defendants, Defendants nevertheless charge the Principal Funds sharp fees for Defendants to ostensibly monitor Defendants' own mutual funds. One would expect that in an arm's-length relationship, there would be a fee discount (or no fee at all) associated with such purported monitoring. But such is not the case here. The Principal Funds are paying layers of unnecessary and excessive fees to their detriment and to Defendants' sole benefit. This sort of fee gouging is precisely the sort that the ICA exists to restrain.

**ANSWER:**  Defendants admit that the LifeTime Funds are funds of funds that invest in other mutual funds, in accordance with and as required by 15 U.S.C. § 80A-12.  Defendants further admit that PMC advises the underlying mutual funds in which the LifeTime Funds invest pursuant to an investment management contract and that PGI sub-advises certain of those underlying funds pursuant to a sub-advisory contract.  Defendants deny all remaining allegations in Paragraph 57.

58.     To the extent that Defendants provide any legitimate services to the Principal Funds (apart from the services provided in exchange for the Investment Management Fee), in

exchange for the roughly $80 million share of the Acquired Fund Fee, those services might include administrative services. The nature and quality of any such ostensible administrative services – if such in fact are actually being performed by Defendants here – at any rate do not justify Defendants taking a roughly $80 million share of the Acquired Fund Fee from the Plaintiff and other investors in the Principal Funds.

**ANSWER:** Defendants admit that PMC provides services to the LifeTime Funds.

Defendants admit that PMC also provides services to the underlying mutual funds in which the

LifeTime Funds invest.  Defendants further admit that PGI provides investment management

services to the LifeTime Funds and to certain of the underlying mutual funds in which the

LifeTime Funds invest. Defendants deny all remaining allegations in Paragraph 58.

### *The Profitability of the Principal Fund to Defendants*

59.     "[T]he profitability of the fund to the adviser' [must] be studied in order that the price paid by the fund to its adviser be equivalent to 'the product of arm's-length bargaining.'" (*See* John P. Freeman & Stewart L. Brown, *Manual Fund Advisory Fees: The Cost of Conflicts* Interest, 26 Corp. L. 610, 661 (2001)). The profitability of a fund to and adviser is a function of revenues minus the costs of providing services. Defendants' reporting of their revenues and costs is intended to, and does, obfuscate Defendants' true profitability.

**ANSWER:** The allegations in the first and second sentences of Paragraph 59 are legal

conclusions that do not require an admission or denial, but to the extent that they do, Defendants

deny all of those allegations.  Defendants deny the remaining allegations of Paragraph 59.

60.     Defendants' costs of providing advisory services to the Principal Funds, especially and specifically as it pertains to the portion of the Acquired Fund Fee retained by Defendants, are nominal while the fee award at bar received by Defendants is massively disproportionate given the nature, quality, and of the services provided to the Principal Funds in exchange for the fee amount in question.

**ANSWER:** Defendants deny all allegations in Paragraph 60.

61.     The Principal Funds debuted in 2001. The assets managed by Defendants within the Principal Funds have grown dramatically since then. Defendants report that as of March of 2011, the Lifetime Funds included over $18 billion in assets under management. (*See Principal LifeTime Timeline*, available at, http://www.principal.com/retirement/lifetime/main/ti meline.htm (last viewed July 3, 2013).)  The revenues, net income, and profit margins deriving from the Principal Funds have increasing exponentially. Over that period, the immense growth of assets

under management involved has generated substantial economies of scale to the great benefit of Defendants.

**ANSWER:**  Defendants admit that each of the LifeTime Funds was initiated in 2001 and that the assets of the LifeTime Funds are greater today than they were in 2001.  Defendants deny the allegations in Paragraph 61 to the extent that they purport to summarize or characterize the document cited therein, which speaks for itself.  Defendants deny the remaining allegations in Paragraph 61.

### *Economies of Scale*

62.     The existence of economies of scale in the mutual fund industry has been confirmed by both the SEC and the Governmental Accounting Office (the "GAO"). Both conducted in-depth studies of mutual fund fees in 2000, and both concluded that economies of scale exist in the provision of mutual fund investment advisory services. *See* SEC Division of Investment Management: Report on Mutual Fund Fees and Expenses (Dec. 2000) ("SEC Report"), at 30-31; GAO Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials; and the Ranking Member, Committee on Commerce, House of Representatives (June 2000) ("GAO Report"), at 9.

**ANSWER:**  The allegations in Paragraph 62 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

63.     The clearest example of these economies of scale occurs when total assets under management increase due purely to market forces (without the institution of new advisory relationships or new asset gathering). In such instances, as the GAO confirms, it is possible for fund advisors (here, Defendants) to service additional assets with zero additional costs. In other words, investment advisors like Defendants can advise a fund that doubles in size purely because of market forces with no increased costs because the services in question provided by the advisors remain unchanged.

**ANSWER:**  The allegations in Paragraph 63 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

64.     Economies of scale exist for the Principal Funds; they are not, however, being passed on to Plaintiff and other investors in the Principal Funds for their benefit as required by the ICA; instead, they simply are appropriated for the benefit of Defendants. Thus, Principal Fund shareholders have incurred actionable losses, because as their legal fiduciaries, Defendants are siphoning off for Defendants' benefit rather than for the benefit of the Principal Funds the monies made available by these economies of scale. The economies of scale benefits that have been captured and misappropriated by Defendants can and do generate huge excessive,

undeserved profits for the Defendants. These profits have been improperly misappropriated from the Principal Funds by, in part, depriving them of the benefits of economies of scale. These benefits can (at least in part) be shared with the Principal Funds, Plaintiff and other shareholders in these funds by reducing fees and other costs charged to the funds by Defendants. In the case of the mutual funds at issue in this case, no such meaningful savings have been shared with the Principal Funds.

**ANSWER:**  The allegations in Paragraph 64 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

65.     The work required to operate a mutual fund does not increase proportionately with the assets under management. "[I]nvestment management efforts, the most important (and most expensive) input into portfolio management, do not increase long with portfolio size. A portfolio manager can invest $5 billion nearly as easily as $1 billion and $20 billion nearly as easily as $10 billion." (Size may impair performance, but it imposes little logistical challenge.) (Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238.) Therefore, "[a]s scale increases, fees as a percentage of assets ought to decline, allowing both fund manager and fund shareholders to benefit." (*Id.*)  Indeed, break points "reflect the economic reality of the direct relationship between decreasing marginal costs and increasing portfolio size." (*Id.*)  According to another fund industry expert, John C. Bogle, the economies of scale generated in the mutual fund portfolio management and research business are "little short of staggering." (John C. Bogle, *The Battle for the Soul of Capitalism* 154 (2005)).

**ANSWER:**  The allegations in Paragraph 65 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

66.     As an example, if a fund has fifty million dollars ($50,000,000) of assets under management and a fee of 75 basis points (100 basis points = 1%), the fee equals $375,000 per year. A comparable mutual fund with five hundred million dollars ($500,000,000) of assets under management would generate a fee of three million seven hundred and fifty thousand dollars ($3,750,000). Similarly, a mutual fund worth five billion dollars ($5,000,000,000) would generate a fee of thirty-seven million, five hundred thousand dollars ($37,500,000) per year.

**ANSWER:**  The allegations in Paragraph 66 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

67.     It simply does not cost a fund's advisor ten times as much to render services to a ten billion dollar ($10,000,000,000) fund as compared to a one billion dollar ($1,000,000,000) fund. In fact, the investment advisory services or securities selection process for a ten billion dollar fund and a one million dollar fund are virtually identical, generating enormous economies of scale. At some point (exceeded by the fund because of their large size), the additional cost to advise each additional dollar in the fund (whether added by a rise in the value of the securities or additional contributions by current or new shareholders) approaches a number at or close to zero.

**ANSWER:**  The allegations in Paragraph 67 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

68.    Advances in computing and communication technologies in the past twenty years have resulted in exponential efficiencies that have dramatically reduced the costs of servicing mutual funds in ways Congress could not have imagined when it enacted ICA § 36(b). Further, as assets under management increase, the cost of providing services to additional assets does not increase at the same rate, resulting in tremendous economies of scale. In the case of the Principal Funds, assets under management have grown, so have the advisory and distribution fees paid to Defendants grown dramatically, despite the economies of scale realized by Defendants. As the fees paid to Defendants (and accepted by them in violation of their statutory fiduciary duties) are unfair, especially when the economies of scale are considered.

**ANSWER:**  The allegations in the first and second sentences of Paragraph 68 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.  Defendants deny all remaining allegations of Paragraph 68.

69.    The economies of scale enjoyed by Defendants with respect to the Principal Funds have not been shared with Plaintiff as required by Section 36(b). As a result, the Acquired Fund Fees that Plaintiff and other investors in the Principal Funds paid to Defendants are grossly disproportionate to the services provided to the Principal Funds, are excessive and violate Section 36(b).

**ANSWER:**  Defendants deny all allegations in Paragraph 69.

***Comparative Fee Structures***

70.    The portion of the Acquired Fund Fee Defendants receive from the Principal Funds are much higher than the fees their competitors receive for substantially similar services. Moreover, the portion of the Acquired Fund Fee Defendants receive from the Principal Funds is per se excessive because Defendants provide little or no services in exchange for the colossal fee.

**ANSWER:**  Defendants deny all allegations in Paragraph 70.

71.    Other investment advisors who offer funds similar to the Principal Funds' model (*i.e.*, where the fund advisors hire sub-advisors to provide most of the investment management services for the funds) such as Vanguard, charge substantially less for the services at issue here than Defendants charge the Principal Funds. As noted above, Defendants' affiliate, Edge, would charge the Principal Funds approximately one-third of the fees at issue in this case that they are paying now. The services provided by these other advisors are the same or substantially similar advisory services that Defendants provide to shareholders of the Principal Funds. Yet, Defendants charged the shareholders of the Principal Funds and collected almost $80 million in 2012 without any justification.

**ANSWER:**  Defendants deny all allegations in Paragraph 71.

72.     Analyzing the fees paid by Defendants' to sub-advisors, or their competitors' fees, or even their affiliates' fees indicate additional ways in which Defendants have violated their fiduciary duties to the Principal Funds by charging them unfair and excessive fees.

**ANSWER:**  Defendants deny all allegations in Paragraph 72.

73.     Defendants hired sub-advisors for all of the Principal Funds, who assumed the obligation of providing essentially all of the substantive investment advisory services to the Principal Funds. As each sub-advisor is a for-profit investment management company that negotiated its fee with Defendants, the fees they charge provide a meaningful benchmark for the cost of the investment advisory services provided to the Principal Funds (and one presumably including a profit margin). Compared to the fees charged by the sub-advisors who actually perform the substantive advisory services to the Principal Funds, the additional fees charged by Defendants and complained of by Plaintiff here – fee monies taken from the Principal Funds by Defendants for little, if any additional services provided to the Principal Funds – are unfair and excessive.

**ANSWER:**  Defendants admit that PMC has contracted with PGI to serve as the sub-

advisor for each of the LifeTime Funds and to provide certain services.  Defendants further admit

that PMC has contracted with certain sub-advisors to provide certain services to the underlying

mutual funds in which the LifeTime Funds invest. Defendants deny all remaining allegations in

Paragraph 73.

74.     While Plaintiff does not challenge the fees paid to the sub-advisors of the Principal Funds, the fee rates paid to the sub-advisors do provide a measure of how much investment advisory services for the Principal Funds in particular actually cost (and the economies of scale realized by the advisors), as the sub-advisors also are for-profit investment management companies. Defendants charge far more than the sub-advisors for the Principal Funds as concerns the Acquired Fund Fee even though, again, the sub-advisors to the Principal Funds assume the obligations to provide the most of the investment advisory services to the Principal Funds. David Swensen, the chief investment officer of Yale University, highlighted this issue in one of his books using the case of the Principal Partners LargeCap Value Fund (now known as the Principal LargeCap Value Fund III):

> Consider the case of the Principal Partners LargeCap Value Fund, one of the family of mutual funds organized by Principal Life Insurance of Des Moines, Iowa. Principal Management Corporation, the manager of the LargeCap Value Fund, actually provides no investment management services, focusing instead on "clerical, recordkeeping and bookkeeping services." Responsibility for the day-in and day-out portfolio management

rests with a subsidiary of Alliance Capital Management, Bernstein Investment Research and Management.

The fee arrangement between Principal and Bernstein involves only a portion of Principal's take from its investors. For the year ended December 31, 2003, Principal's no-load class B shares bore the burden of a 2.51 percent expense ratio . . . Investors paid a 12b-1 fee of 0.91 percent, other expenses of 0.85 percent and a management fee of 0.75 percent. Principal's fees all but guarantee that investors will fail to generate satisfactory returns.

The management fee arrangement between Principal and Bernstein provides clues to the economies of scale available in the money management industry. At asset levels below $10 million, of the 0.75 percent management fee, 0.60 percent goes to Bernstein and 0.15 percent goes to Principal. As assets under management increase, Bernstein's fee share decreases and Principal's fee share increases. At the final breakpoint of $200 million in assets, of the scale-invariant 0.75 percent fee, Bernstein receives 0.20 percent and Principal receives 0.55 percent.

The fee structure clearly illustrates scale economies in the investment management business. Bernstein, the party responsible for the heart of the portfolio management process, earns fees that diminish (with increases in assets under management) from 0.60 percent of assets to 0.20 percent of assets. Since Bernstein's work changes not at all as asset levels increase, the reduction in marginal charges makes sense.

It makes no sense that Principal's mutual-fund clients accrue no benefits from economies of scale. Total expenses incurred by investors remain at 2.51 percent regardless of portfolio size. As Bernstein's management fee declines, Principal's management fee increases. For assets above $200 million Principal adds a management fee of 0.55 percent to other fees of 1.76 percent, bringing the egregious total to 2.31 percent for Principal and 0.20 percent for Bernstein. In this topsy-turvy world, Principal earns a marginal management fee of 0.55 percent for performing back-office functions, while Bernstein earns a marginal management fee of 0.20 percent for making security-selection decisions. As scale increases, Bernstein earns less while Principal takes more.

(David F. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 238-240 (2005).)

**ANSWER:**  Defendants admit Plaintiff's concession that it "does not challenge the fees paid to the sub-advisors of the [LifeTime] Funds."  The remaining allegations in Paragraph 74 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.

75.     Put bluntly, in situations like that now before the Court, "[f]und managers . . . routinely add a hefty 'premium' or 'monitoring fee' to the sub-advisers' charge. True, the sub-adviser may charge only 30bps for its investment advice, but the manager will then typically pad the bill, adding an additional twenty to thirty basis points 'premium' before passing along the advisory fee charge to fund shareholders." (*See* John P. Freeman, Stewart L. Brown & Steve Pomerantz, *Mutual Fund Advisory Fees:  New Evidence and a Fair Fiduciary Test*, 61 Okla. L. Rev. 83, 113 (2008). Indeed, "overall fee levels for sub-advised funds are substantially higher than for funds managed in-house."  (*Id*. at 118.) ***Defendants here did precisely this***, padding the fee bill to the Principal Funds at issue by nearly $102 million in fiscal year 2013 for providing few, if any additional services, beyond those already provided by the Principal Funds' sub-advisors and/or board members.

**ANSWER:**  The allegations in the first, second, and third sentences of Paragraph 75 are legal conclusions that do not require an admission or denial, but to the extent that they do, Defendants deny all of those allegations.  Defendants deny the remaining allegations in Paragraph 75.

76.     As further illustration, Vanguard offers a similar balanced product with moderate risk — namely, the Vanguard LifeStrategy Moderate Growth Fund ("LifeStrategy"), a fund of funds that invests in other Vanguard mutual funds. The LifeStrategy fund pays approximately 20 basis points for investment management services of the sort for which Defendants charge more than triple that amount of basis points to the Principal Funds.

**ANSWER:**  Defendants deny all allegations in Paragraph 76.

***Fallout Benefits***

77.     Defendants indirectly  profit because of the existence of the Principal Funds through so-called fallout benefits, *i.e.*, indirect benefits to the Defendants attributable in some way to the existence of the Principal Funds. For example, courts have held that float revenue earned by investment advisory affiliates on free credit balances awaiting sweep into a money market fund should be considered as a fall out benefit of the adviser's contract with the money market fund.

**ANSWER:**  Defendants deny all allegations in Paragraph 77.

78.     These obvious fallout benefits include the attraction of new customers, cross selling related funds to current customers, and other benefits associated generally with the development of goodwill and the growth in assets of the Principal Funds.

**ANSWER:**  Defendants deny all allegations in Paragraph 78.

79.     Other, easier to quantify, fallout benefits include "soft dollars" payable from broker-dealers or other service providers to mutual funds. Essentially, "soft dollars" are credits furnished to Defendants from securities-industry firms in exchange for routing the Principal Funds' securities transaction orders and other business to paying firms. In short, those soft dollars here were in reality not so soft:  Plaintiff and other investors in the Principal Funds paid roughly $40 million annually for core investment management services to the sub-advisors. The soft-dollar credits resulting from the annual $40 million paid to sub-advisors should have been used to purchase research and other goods or services that would benefit the shareholders of the Principal Funds. But the soft dollar arrangement at bar instead benefitted Defendants and resulted in increased costs to the shareholders of the Principal Funds with little to no corresponding benefits to the shareholders of the Principal Funds. This self-serving use of the soft dollar mechanism by Defendants amounts to a violation of the ICA by Defendants, and judgment for Plaintiff is thus in order.

**ANSWER:**  Defendants deny all allegations in Paragraph 79.

80.     Defendants may receive further fallout benefits from securities lending arrangements. Essentially, in that event, Defendants loan out the securities of the Principal Funds and receive compensation as the lending agents of the Principal Funds. Defendants may, in that event, reap colossal profit from this arrangement, as well.

**ANSWER:**  Defendants deny all allegations in Paragraph 80.

81.     A highly profitable fallout benefit to Defendants is the ability to sell investment advisory services paid for by the Principal Funds at virtually no additional cost. Much like computer software, once the investment research and resulting recommendations are paid for, that research and those recommendations may be sold to other clients at virtually no cost whatsoever to Defendants. Without payment by Plaintiff and the Principal Funds of millions of dollars in investment management and other fees, Defendants themselves would have to pay to conduct that research independently in order to provide investment advisory services to other clients, including institutional clients. This is a natural byproduct of the extraordinary economies of scale inherent in the investment advisory business. However, although Plaintiff and other shareholders of the Principal Funds pay all of the costs associated with the investment advisory services, Defendants resell these services to third parties without compensating Plaintiff through reduced fees or in any other way.

**ANSWER:**  Defendants deny all allegations in Paragraph 81.

82.     Defendants do not provide sufficient information regarding the existence and extent of these and other fallout benefits to the shareholders of the Principal Funds or to the

Principal Funds' directors. The evidence demonstrating the validity of this allegation is believed to be within Defendants' sole possession.

**ANSWER:**  Defendants deny all allegations in Paragraph 82.

83.    In sum, Plaintiff and other shareholders of the Principal Funds have paid for these benefits and are entitled under the ICA to compensation for those payments in the form of reduced fees for the Principal Funds.

**ANSWER:**  Defendants deny all allegations in Paragraph 83.

### *The Independence and Conscientiousness of the Principal Fund Directors*

84.    Fees paid to Defendants are technically approved by the Principal Funds' Board of Directors. A majority of the Principal Funds' board is comprised of statutorily presumed "disinterested" directors as that term is defined in § 10 of the ICA. Regardless of whether these presumably "disinterested" directors meet the requirements of § 10 of the ICA, there is a lack of conscientiousness by the directors in reviewing the fees paid to Defendants by each of the Principal Funds.

**ANSWER:**  Defendants admit that the fees paid to Defendants are approved by the

Principal Funds, Inc. board of directors, and that a majority of the board is disinterested pursuant

to Section 10 of the Investment Company Act of 1940.  Defendants deny all remaining

allegations in Paragraph 84.

85.    The materials provided by Defendants to the directors of the Principal Funds establish that the nature of the services Defendants render to the Principal Funds. These materials have remained largely unchanged despite dramatic growth in the assets of the Principal Funds and fee revenues.

**ANSWER:**  Defendants admit that the Principal Funds, Inc. board of directors are

provided with materials describing Defendants' services to the LifeTime Funds.  Defendants

deny all remaining allegations in Paragraph 85.

86.    In addition, even if statutorily disinterested, the directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by Plaintiff and other shareholders of the Principal Funds. In particular, Defendants do not provide the directors with sufficient information for the directors to fulfill their obligations, a factor supporting a finding that Defendants have breached their fiduciary duties.

**ANSWER:**  Defendants deny all allegations in Paragraph 86.

87.     The disinterested directors are supposed to serve as "watchdogs" for the shareholders of the Principal Funds. As such, the disinterested directors have primary responsibility for, among many other things, negotiating and approving all contracts and agreements with Defendants and reviewing the reasonableness of the fees received by Defendants. Accordingly, as noted by the GAO, the directors are expected to review, among other things, the advisor's costs, whether fees have been reduced when the Fund's assets have grown, and the fees charged for similar services. (*See* GAO Report at 14.)  These responsibilities are intensive, requiring the directors to rely on information provided by Defendants. Defendants, in turn, have a fiduciary duty to provide all information reasonably necessary for the directors to perform their obligations. *See* 15 U.S.C., § 80a-15(c); 17 C.F.R. § 270.12b-1.

    **ANSWER:**  The allegations in Paragraph 87 are legal conclusions that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

88.     The ICA contains a presumption that the disinterested directors are in fact disinterested. However, the lack of conscientiousness of even disinterested directors in reviewing the fees paid by the Principal Funds, the lack of adequate information provided to the directors in connection with their approvals of the operative agreements and, the control of management over the directors in reviewing the fees paid by the Principal Funds are not presumed but, rather, are important factors in determining whether Defendants have breached their fiduciary duties. In addition, the SEC has specifically recognized that even disinterested directors may not be independent but, rather, may be subject to domination or undue influence by a fund's investment adviser. For example, the SEC has stated that "disinterested directors should not be entrusted with a decision on use of fund assets for distribution without receiving the benefit of measures designed to enhance their ability to act independently." (Bearing of Distribution Expenses by Mutual Funds, Investment Co. Act Rel. No. 11414, 1980 SEC LEXIS 444, at *36 (Oct. 28, 1980)).

    **ANSWER:**  The allegations in Paragraph 88 are legal conclusions that do not require an

admission or denial, but to the extent that they do, Defendants deny all of those allegations.

89.     Defendants' $80 million windfall complained of herein indicates prima facie that Defendants did not keep genuinely disinterested and independent directors of the Principal Funds fully informed regarding all material facts and aspects of their fees and other compensation. A truly independent board of directors would not have tolerated the complained-of fee assessment charged by Defendants if it had obtained adequate information regarding, among other things: the sub-advisory fees Defendants paid for the Principal Funds and the services received by the Principal Funds from Defendants for fees they charged; the advisory fees charged and services provided by competitors with similar fund structures; the advisory fees and services provided to Defendants' pension and other institutional clients; the economies of scale enjoyed or fallout benefits received by Defendants; the profitability data, and how to evaluate the profitability data in light of economies of scale.

    **ANSWER:**  Defendants deny all allegations in Paragraph 89.

90.     As aforementioned and documented, mutual fund boards of directors rarely, if ever, question any information or recommendations provided by mutual fund investment advisors. The evidence needed to establish the truth of these allegations is believed to be exclusively in the control of Defendants and is not in Plaintiff's possession at this time.

**ANSWER:**  Defendants deny knowledge or information sufficient to respond to the first

sentence in Paragraph 90, but to the extent it is asserted against the LifeTime Funds' board,

Defendants deny the allegation.  Defendants deny all remaining allegations in Paragraph 90.

91.     The boards of directors of the Principal Funds are materially dependent on Defendants for information concerning the investment and fee structure that applies to the Principal Funds and thus ineluctably has allowed Defendants to dominate and unduly influence the various boards' directorship of the funds.

**ANSWER:**  Defendants deny all allegations in Paragraph 91.

## COUNT I
## ICA §36(b)
## BREACH OF FIDUCIARY DUTY
### (Unfair and Excessive Fees)

92.     Plaintiff repeats and re-alleges each allegation contained in the foregoing paragraphs of this complaint as of if fully set forth herein.

**ANSWER:**  Defendants respond to the allegations incorporated in Paragraph 92 by

repeating and incorporating their responses to the foregoing paragraphs as if fully set forth

herein.

93.     The fees charged by Defendants for providing advisory services to the Principal Funds represent a breach of Defendants' fiduciary duty to the Principal Funds because they are unfair, excessive, and were not negotiated at arm's length in light of all the surrounding circumstances. Plaintiff specifically alleges that all unfair and excessive fees alleged herein have inured to the benefit of, and been received by, Defendants.

**ANSWER:**  Defendants deny all allegations in Paragraph 93.

94.     In charging and receiving inappropriate compensation, and in failing to put the interests of Plaintiff and the other shareholders of the Principal Funds ahead of their own interests, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiff in violation of ICA § 36(b), both as a result of a flawed negotiating process and with respect to the substantive amounts of the fees.

**ANSWER:**  Defendants deny all allegations in Paragraph 94.

95.     Plaintiff seeks, pursuant to § 36(b)(3) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, "the amount of compensation or payments received from" the Principal Funds or, pursuant to 15 U.S.C. § 80-46(b) ("§ 47(b) of the ICA"), rescission of the contracts.

**ANSWER:**  Defendants deny that Plaintiff is entitled to any relief from Defendants

under the Investment Company Act of 1940 (or otherwise), and therefore deny the allegations in

Paragraph 95.

**COUNT II**
**ICA §36(b)**
**BREACH OF FIDUCIARY DUTY**
**(Excess Profits from Economies of Scale)**

96.     Plaintiff repeats and re-alleges each allegation contained in the foregoing paragraphs of this complaint as of if fully set forth herein.

**ANSWER:**  No response to Paragraph 96 is required because the Court has dismissed

this count of the Complaint. (Dkt. 86.) To the extent that a response is required, Defendants

respond to the allegations incorporated in Paragraph 96 by repeating and incorporating their

responses to the foregoing paragraphs as if fully set forth herein.

97.     Defendants have received and continue to receive excess profits attributable to extraordinary economies of scale.

**ANSWER:**  No response to Paragraph 97 is required because the Court has dismissed

this count of the Complaint. (Dkt. 86.) To the extent that a response is required, Defendants deny

all allegations in Paragraph 97.

98.     By retaining excess profits derived from economies of scale, Defendants have breached and continue to breach their statutory fiduciary duty to Plaintiffs in violation of ICA § 36(b).

**ANSWER:**  No response is required to Paragraph 98 because the Court has dismissed

this count of the Complaint. (Dkt. 86.) To the extent that a response is required, Defendants deny

all allegations in Paragraph 98.

99.     Plaintiff seeks, pursuant to ICA § 36(b) of the ICA, the "actual damages resulting from the breach of fiduciary duty" by Defendants, up to and including, the "amount of compensation or payments received from" the Principal Funds.

**ANSWER:**  No response to Paragraph 99 is required because the Court has dismissed

this count of the Complaint. (Dkt. 86.) To the extent that a response is required, Defendants deny

all allegations in Paragraph 99.

<u>**\*   \*   \***</u>

**ANSWERING FURTHER, DEFENDANTS DENY ALL ALLEGATIONS THAT**

**THEY HAVE NOT ADMITTED, INCLUDING BUT NOT LIMITED TO ALL HEADERS**

**THROUGHOUT THE COMPLAINT AND PLAINTIFF'S DEMAND FOR JUDGMENT**

**AS SET OUT ON PAGES 30 AND 31 OF THE COMPLAINT.**

## <u>AFFIRMATIVE DEFENSES</u>

By alleging the Affirmative Defenses set out below, Defendants intend no alteration of the burden of proof and/or burden of going forward with evidence which otherwise exists with respect to any particular issues at law or in equity.  Furthermore, all such defenses are pleaded in the alternative, and do not constitute an admission of liability or an admission that Plaintiff is entitled to any relief whatsoever.

### <u>First Affirmative Defense</u>

The Complaint fails to state a claim upon which relief may be granted.

### <u>Second Affirmative Defense</u>

Plaintiff lacks standing to challenge the AFFE.

### <u>Third Affirmative Defense</u>

Plaintiff's claims are barred in whole or in part by the doctrines of waiver, estoppel,

laches, disclosure and/or consent, ratification, unclean hands, and/or other related doctrines.

### <u>Fourth Affirmative Defense</u>

The Investment Company Act limits recovery of any damages to those incurred during

the period one year before the institution of the action.

## Fifth Affirmative Defense

The claims against PGI are non-actionable or barred because Plaintiff admits that it is not challenging any fees paid to sub-advisors, and PGI was only paid in its capacity as a sub-advisor.

## Additional Affirmative Defense

Defendants may have additional, as yet unidentified defenses available. Additional defenses may be revealed by further investigation or through discovery. Accordingly, Defendants reserve the right to assert any and all such defenses in a timely fashion after the facts to support such defenses become known to them.

WHEREFORE, Defendants pray that this Court enter judgment in Defendants' favor as follows:

1.      That judgment be entered in favor of Defendants;

2.      That Plaintiff takes nothing from Defendants and that the Complaint be dismissed with prejudice;

3.      For costs, attorneys' fees, expert witness fees, and court costs incurred herein; and

4.      For such other and further relief as this Court deems just and proper.

Dated:  October 13, 2014

Respectfully submitted,

  /s/ Mark B. Blocker

Angel West, AT0008416
aaw@nyemaster.com
Matthew R. Eslick
mreslick@nyemaster.com
700 Walnut Street
Suite 1600
Des Moines, Iowa 50309
Telephone:  (515) 283-3167
Fax:  (515) 283-3108

Mark B. Blocker (admitted pro hac vice)
mblocker@sidley.com
Sarah H. Newman (admitted pro hac vice)
snewman@sidley.com
Jen C. Won (admitted pro hac vice)
jwon@sidley.com
Sidley Austin LLP
One South Dearborn St.
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Alex. J. Kaplan (admitted pro hac vice)
ajkaplan@sidley.com
Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel for Defendants*
*Principal Management Corporation and*
*Principal Global Investors, LLC*

## CERTIFICATE OF SERVICE

I certify that on October 13, 2014, I electronically filed the foregoing with the Clerk of Court using the ECF system, which will send notification of such filing to the parties participating in the Court's electronic filing system.

/s/ Mark B. Blocker